# STANDARD TIME CHARTER
## (PETROLEUM PRODUCTS & ETHANOL)

| OWNER | | CHARTERER | |
|---|---|---|---|
| NAME | : Harley Marine Financing, LLC | NAME | : Aloha Petroleum LLC |
| ADDRESS | : P.O. Box 94247 | ADDRESS | : 3805 West Chester Pike |
| CITY, STATE | : Seattle, WA 98124 | CITY, STATE | : Newtown Square, PA 19073 |
| CONTACT | : Jennifer Beckman | CONTACT | : Amber Harach |
| TELEPHONE | : 310-968-9586 | TELEPHONE | : 610.833.3525 |
| E-MAIL | : jbeckman@centerlinelogistics.com | E-MAIL | : amber.harach@sunoco.com |

| TUG | | BARGE | |
|---|---|---|---|
| NAME | : Montelake | NAME | : SoDo |
| O.N. | : | O.N. | : |
| DIMENSIONS | : | CAPACITY | : 52,500 @ 95% |
| H.P. | : | TYPE/USE | : Terminal |

| HIRE AND OTHER CHARGES | | DELIVERY | |
|---|---|---|---|
| HIRE | : $16,000/day | PORT/PLACE | : Seattle, WA |
| | | DATE/TIME | : Dec 15, 2022 – Jan 15, 2023 |
| | | **REDELIVERY** | |
| OTHER | : 18-month firm period | PORT/PLACE | : Seattle, WA |
| | | EST. DATE | : TBD |

| DESCRIPTION OF SERVICES AND SPECIAL AGREEMENTS |
|---|
| The daily hire rate shall be $16,000 for 18 months' firm period. Charterer shall have 4, 6-month options, declarable 3 months prior to period expiration, all optional periods subject to Owner's express written consent, not to be unreasonably withheld. The daily hire rate for all optional periods shall be $16,000. |
| If a lightering master/lightering specialist is required, and not already supplied by the other vessel, Owner will provide at a flat daily hire rate of $3,000 per person. |
| The tug shall be capable of being fueled directly from the barge. The cost and time of the needed modification and/or equipment shall be at the Charterer's expense. |

The Contracting Party is Harley Marine Finance ("HMF") as Owner/Carrier and the Vessel Operator is Olympic Tug and Barge and is an affiliate and subcontractor to HMF and shall be performing the transportation services hereunder.

**EXHIBIT A**

The term "Owner/Carrier" for purposes hereof shall be deemed to include the said Vessel Operator. Owner agrees to let and Charterer agrees to hire, on a time charter basis and pursuant to the terms and conditions of this agreement, the Vessels identified above for the purpose of transporting Charterer's cargoes of petroleum products and, provided Owner/Carrier incurs no obligations above and beyond the terms herein, ethanol; the terms Vessel, Vessels and Vessel(s) shall refer to the Tug and/or Barge identified above as is consistent with the context in which the term is utilized.

Subcontracting clause
Owner/Carrier may subcontract any portion or all of the services being provided, including to the Operator named above or other affiliate(s), subject to the approval of Charterer, which shall not be unreasonably withheld.  No such subcontracting shall relieve Owner/Carrier of its obligations hereunder.

Subletting clause
Charterer may sublet the tug and barge being provided together as one unit, to a third party at market rates, or an affiliate(s), subject to the approval of Owner/Carrier, including as to any sub-charterer's creditworthiness, which shall not be unreasonably withheld, and subject to sub-charter hire being billed by Charterer to Sub-charterer, and Charterer remaining obligated to Owner/Carrier for charter hire as invoiced from Owner/Carrier to Charterer as agreed hereunder.  No such subcontracting shall relieve Charterer of its obligations hereunder.


1.      **DELIVERY AND REDELIVERY; TANK CLEANING**

Owner shall deliver the Vessels on the date/time and port/place agreed unless reasons beyond Owner's control prevent or delay the same.  Owner shall deliver the Barge for the first voyage with clean tanks, ready for loading.  Charterer shall be entitled to utilize the entirety of the Barge's tank spaces to transport its cargoes, subject to the specifications, capabilities and limitations, including load line, stability and safety considerations, applicable to the Vessels.  After initial delivery, Charterer may, at any time at its expense, inspect such tank spaces as it deems appropriate, including retains therein, and/or may engage a contractor to do so.  Any tank rinsing, flushing or cleaning, etc. after initial delivery shall be specifically requested by Charterer and accomplished at Charterer's expense.  Charterer's decision that any tank space is clean, or that cargoes are compatible with present retains, including its decision to not request any rinsing, flushing or cleaning, etc. prior to loading cargoes, shall be at Charterer's risk and expense.

At the conclusion of the charter term and prior to redelivery of the Vessels to Owner, any tank rinsing, flushing or cleaning, etc. requested by Owner to remove Charterer's cargoes/residues/retains which are inconsistent with the customary trade of the Barge shall be accomplished at Charterer's expense (and with Charterer to have the option to accomplish the same at its facility or elsewhere), including the responsibility for and costs of disposal, and redelivery shall not be deemed to have occurred until such tank cleaning has been accomplished.  Notwithstanding the foregoing, however, at Owner's option and upon Owner's notice to Charterer that Charterer's last cargoes loaded to the Barge are compatible with Owner's next contemplated use of the Barge, Owner may accept responsibility for tank cleaning, etc. and disposal of residues/retains at the time of redelivery.

Owner shall have the right to substitute the vessel named in this agreement for a like, or similar, piece of equipment, with little or no service interruption for the Charterer, with due notice and always subject to Charterer's consent, which not be unreasonably withheld.

## 2.    SCHEDULING

Owner and Charterer shall meet following execution of this agreement and well in advance of any voyage hereunder to identify loading/discharging ports, types/grades of cargoes and voyage scheduling, with the ports, cargoes and dates/times for a voyage to be mutually agreed as early as possible.  Thereafter, the parties shall meet in person or communicate by telephone or e-mail at least weekly to schedule/confirm ports, cargoes and dates for subsequent voyages, if applicable.  All such scheduling shall take into account the capabilities of the Vessels, distances and routine fortuities such as weather and tide, as well as Charterer's transportation needs and Owner's maintenance requirements. For each voyage, Owner and Charterer shall confirm with particularity and in writing the types, grades and quantities of cargoes a minimum of three (3) business days prior to loading, as well as precise loading, transfer and discharging protocols with due regard for previous cargoes, retains and proper segregation.  If insufficient notice is given to Owner for any voyage, and/or if Owner determines that tank rinsing, flushing or cleaning is necessary notwithstanding Charterer's lack of request for the same, Owner may delay the voyage and/or flush, rinse or clean tanks without deduction in hire, as Owner deems necessary, but with Owner to promptly advise Charterer of the same.

Owner shall keep Charterer informed as to the locations of the Vessels while they are on voyage on at least a daily basis by telephone and/or e-mail.

## 3.    MAINTENANCE

Owner shall be entitled to 48 hours each month for routine maintenance of the Vessels, non-cumulative to the succeeding month, however Owner shall be entitled to 48 hours per month cumulative for unplanned maintenance, throughout the charter term including any extension; provided, however, the total number of cumulative hours for unplanned maintenance shall not exceed 576 hours during any twelve (12) month period for the charter term, including any extension. If the term is less than a month then the foregoing shall not apply.  Maintenance shall be scheduled in advance and hire shall continue during such maintenance time.  In each instance, Owner agrees to return the Vessels to service promptly following the completion of such maintenance.

## 4.    HIRE, CHARGES AND PAYMENT

A.    <u>Hire</u>.  Charterer shall pay hire for use of the Vessels at the rate identified above for the full charter term, i.e. from delivery until redelivery as set forth in this agreement.

B.    <u>Fuel and Lubricants</u>.  Fuel and lubricants, including pin lubricants, consumed by the Vessels while performing under this agreement shall be:

☐ deemed included within the hire rate; or
☒ separately paid/reimbursed by Charterer at Owner's actual cost thereof.

C.    <u>Breakdown</u>.  In the event the Vessels or either of them breaks down or otherwise becomes unable to perform services for reasons within Owner's ability to control, and through no fault of Charterer, and should such breakdown or inability to perform remain for a period of <u>72</u> continuous hours without Owner having provided a substitute or otherwise resumed performance, hire shall be suspended from the time such breakdown/inability first began until performance has been resumed.  However, Owner may utilize any unused portion of maintenance time identified in section 3, above, as to any such breakdown and without suspension of hire, but upon exhaustion of such allowance hire shall be suspended.  Capped at a maximum of 12 days per calendar year. Notwithstanding the foregoing, Owner shall endeavor to provide a comparably sized, equipped, and already located/trading USWC/Hawaii at the time of breakdown, substitute regardless of the hire rate of such substitute vessel.

D.    Fees, Charges and Taxes.  Charterer shall be responsible for all fees, charges and expenses accruing during the charter term and relating to the Vessels, cargoes and/or services being provided, including without limitation all customs, port, canal, harbor entrance, dockage, wharfage, pilotage, assist towage, loading/unloading, environmental, spill response and other fees, charges and expenses (including without limitation those for transiting through the Panama Canal, if applicable).  All use, ad valorem, value added, sales, property and other taxes levied and/or assessed by any taxing entity whatsoever shall be solely Charterer's responsibility, other than taxes directly applicable to Owner under United States law by virtue of its receipt of hire hereunder.  To the extent Owner arranges or advances payment for any of the foregoing items which have been allocated to Charterer, Owner shall be deemed to have done so on behalf of Charterer, and Charterer shall promptly pay/reimburse Owner for the same.

E.    Invoice and Payment.  Hire and all other charges due Owner shall be due and payable twenty (20) days from date of Owner's invoice.  All payments shall be made to Owner in U.S. currency and without deduction or setoff.  Sums due but not paid shall accrue interest at the rate of one percent (1%) per month.

5.    **OWNER'S WARRANTIES AND PERFORMANCE**

A.    Warranties.  Owner shall use due diligence to tender the Vessels in a seaworthy condition, equipped and manned sufficiently for performance of services as contemplated, and with all documentation, licensing and permits required for the routine operation of the Vessels.  Owner shall perform services with due dispatch, but makes no warranty as to speeds or arrival/departure times.  Other than the foregoing, neither Owner nor the Vessels shall be held to any warranty whatsoever, express or implied, including any absolute or other warranty of seaworthiness, any warranty of fitness/suitability for any purpose/use, or any warranty of workmanlike service.

B.    Exclusive Control.  Owner shall man, navigate, victual, operate, repair and supply the Vessels, and shall have exclusive control over the Vessels, subject to Charterer's general directions and cargo operations; Charterer shall advise Owner of ports, schedules and cargoes, but the manner and means of performance of services shall at all times be left to the judgment, discretion, direction and control of Owner and the master of the Tug.

C.    Liberties.  The Vessels shall be at liberty as to routes, speeds and towing arrangements, may sail with or without pilots, may be towed or engage assist towage and/or may call at any port/place to replenish fuel, oil, stores or other necessaries and/or make repairs.  Owner and the Vessels may deviate in attempt to save life or property at sea, but shall not leave the Barge unattended unless in a safe position.  Any salvage award applicable to the Vessel(s) shall be shared equally by the parties after deduction of actual expenses and/or physical damages to property suffered by a party as a result thereof.  Owner may substitute equipment of similar capabilities, characteristics and capacity for the Vessels identified above or either of them upon notice to Charterer, with due notice and always subject to Charterer's consent, which not be unreasonably withheld.

D.    Legal Compliance.  Owner shall comply with all federal, state and local laws applicable to the operation of its Vessels.  Owner has MTSA security and OPA-90 /emergency response plans for the Vessels and shall at all times comply with the provisions of such plans and the legal requirements applicable to such plans.  Owner shall maintain membership in the American Waterways Operators Responsible Carrier Program and ISO 1400 certification during the full term of this agreement.

E.    Drug and Alcohol Program.  Owner has a drug and alcohol abuse policy applicable to Vessel crewmembers which meets or exceeds the standards of the U.S. Coast Guard; the testing and screening of Vessel crewmembers includes reasonable cause testing,

random testing, pre-employment testing and testing during routine medical examinations. Owner shall maintain and comply with this policy during the full term of this agreement.

F.    <u>Loading/Discharging</u>.  Owner and its tankermen shall perform the loading and discharging of cargoes to/from the Barge.

G.    <u>Pilotless Berthing</u>.  Owner shall make all reasonable efforts while remaining in compliance with applicable regulations, but shall in no way be obligated, to maintain a single master for the Vessels during the charter term, including any extension, so that such master complies with the requirements for pilotless berthing provided in 46 CFR § 15.812.

## 6.    CHARTERER'S WARRANTIES AND PERFORMANCE

A.    <u>Warranties</u>.  Charterer warrants that the Vessels shall not be required to force or break ice, or call at any port/place with ice, and that the Vessels shall otherwise be able to enter into, operate in and be shifted within, and lie at and depart from, each port/place and berth of call safely afloat at all times, seasons and stages of tide.

B.    <u>Inspection</u>.  Charterer shall be responsible for inspecting the Vessels prior to delivery to determine their suitability and fitness for the intended services, with Charterer to note any deficiencies in writing to Owner.  Upon Charterer's acceptance or the loading of cargoes, whichever shall first occur, it shall be deemed acknowledged by Charterer that the Vessels are suitable and fit for the intended services.

C.    <u>Ports of Call</u>.  Charterer shall at its expense arrange access and berthing for Owner and the Vessels at all ports/terminals of loading/discharging, with such to be included within the scheduling described above and identified to Owner sufficiently in advance.

D.    <u>Lawful Carriage and Cargo Documents</u>.  Charterer warrants it owns the cargoes or has full rights with respect thereto and to enter into this agreement on behalf of the cargo owner.  Charterer shall not request the Vessels be employed in any unlawful carriage whatsoever, and Charterer shall not provide any unlawful cargoes nor cargoes the carriage of which would violate any law.  Charterer shall be responsible for all customs clearances, cargo manifests, receipts, invoices, bills of lading and other documents relating to the cargoes or their transportation, and for dealing with all shippers, consignees and owners of the cargoes as well as with any other person or entity having an interest in, or making claim to, through or with respect to the cargoes.  Upon request, the Tug master may execute receipts or bills of lading, in which event he/she shall be an authorized agent of Charterer; no bill of lading executed by the Tug master shall affect this agreement or enlarge the responsibilities or liabilities of Owner hereunder.

## 7.    PERIODS OF RESPONSIBILITY

Owner's responsibility for cargoes shall commence at loading as such cargoes pass the Barge riser, or as such cargoes pass from the shore riser into the hose if Owner provides the hose and makes the physical connection between hose and shore riser.  Owner shall remain responsible for distribution/stowage of the cargoes aboard the Barge and the transportation of such cargoes to the port/place or ship of discharge. Owner's responsibility for cargoes shall cease as the cargoes pass the Barge riser at port/place or ship of discharge, or as they pass from the hose into the shore or ship riser if Owner provides the hose and makes the physical connection between the hose and shore or ship riser.

Charterer shall be solely responsible for the cargoes at all times before and at all times after the period of responsibility applicable to such cargoes as allocated to Owner in the paragraphs immediately above.

This section defines each party's respective period of responsibility for cargoes for the purposes of subsections 8.A.(1).(b). and 8.A.(2).(b)., below, only.

8.    **LIABILITY AND INDEMNITY**

    A.    <u>Allocation of Liabilities</u>.

        (1).    <u>Owner</u>.  Owner shall be responsible for all loss, damage, expense, claim, liability, suit, fine and/or penalty applicable to:

            (a).    the Vessels, personal property or employees of Owner, howsoever caused and even if resulting from the negligence or other legal fault of Charterer; and

            (b).    any release or discharge of cargoes during the period of responsibility assumed for such cargoes by Owner in section 7., above.

        (2).    <u>Charterer</u>.  Charterer shall be responsible for all loss, damage, expense, claim, liability, suit, fine and/or penalty applicable to:

            (a).    the cargoes (including shortage, contamination, failure to deliver and misdelivery, as well as general average and salvage charges), personal property and/or employees of Charterer, howsoever caused and even if resulting from the negligence or other legal fault of Owner or the unseaworthiness of a Vessel; and

            (b).    any release or discharge of cargoes before or after the period of responsibility assumed for such cargoes by Owner in section 7, above.

        (3).    <u>Both</u>.  As to any matter not specifically addressed under this agreement, each party shall be responsible for all loss, damage, expense, claim, liability, suit, fine and/or penalty to the extent of its proportionate degree of fault or legal liability.

    B.    <u>Indemnity</u>.  Each party agrees to indemnify and hold harmless the other party (including costs and legal fees) of and from any loss, damage, claim, liability, suit, fine and/or penalty allocated to it pursuant to subsection A, above; in furtherance of the foregoing indemnity for employee claims, each party shall waive any immunity from suit and/or exclusivity of remedy afforded by any workers compensation act or similar law.

9.    **INSURANCE REQUIREMENTS**

    A.    <u>Owner</u>.  Owner shall, at its expense including the costs of premiums, deductibles and all other policy related charges, procure and maintain, or cause to be procured and maintained, the following insurances at all times while performing hereunder:

        (1).    hull and machinery insurance upon the Vessels pursuant to Pacific Coast Tug/Barge Form (1979), or equivalent, to their full actual market values;

        (2).    protection & indemnity insurance, including coverage for pollution/environmental liabilities, pursuant to a standard protection & indemnity club entry but in no event less than One Billion Dollars (US $1,000,000,000); and

(3).    workers compensation and employers liability insurance upon its employees, with coverage under the Longshore Act as well as applicable state acts, statutory limits for workers compensation and limits of at least One Million Dollars (US $1,000,000) for employers liability.

B.    <u>Charterer</u>.  Charterer shall, at its expense including the costs of premiums, deductibles and all other policy related charges, procure and maintain (or cause to be procured and maintained) the following insurances for the full duration of this agreement:

(1).    all risk cargo/property insurance upon all cargoes to be transported, including coverage for contamination and shortage, to their full delivered values plus the costs of freight and insurance, all of which may be covered by Charterer's self-insurance program, subject to evidence of adequate self-insurance supplied to Owner/Carrier; and

(2).    pollution/environmental liability insurance, including coverage for damages, cleanup and restoration costs, sufficient to provide coverage for Charterer's responsibilities hereunder and at law.

C.    <u>Conditions</u>.  All policies shall provide a waiver subrogation as to the non-procuring party and provide at least twenty (20) days written notice to both parties in the event of any decrease in limits, cancellation, non-renewal or other material change in policy terms or conditions.  All insurances shall otherwise be upon such forms and with underwriting security reasonably acceptable to both parties.  Prior to the commencement of services, each party shall provide the other party with certificates confirming the insurances required above.

D.    <u>Failure of Insurance</u>.  Each party shall indemnify and hold harmless (including costs and legal fees) the other party from any policy deductible or premium obligation allocated to it, from the failure to provide and maintain an insurance as required in this agreement, from the failure (for any reason) of any insurance, and/or from any other breach of the insuring requirements set forth under this agreement.  The foregoing indemnification agreement shall cover, as well, any breach of warranty or other policy condition.

## 10.    GENERAL AVERAGE

General average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, excluding Rule B thereof, at such port or place selected by Owner, and as to matters not provided for by said Rules according to the laws and usage of the Port of Seattle, with the Tug and Barge not deemed in a common maritime adventure unless each Vessel is actually and directly exposed to a common peril; a Vessel is not in common peril with another if by disconnecting from such other it is in a position of safety or ceases to be actually and directly exposed to such peril.  For purposes of said Rules, the parties acknowledge that the cargoes are carried in accordance with the recognized custom of the trade.

To the extent required by Owner, average agreement, bond and additional security shall be furnished by Charterer prior to discharge/release of cargoes.  Any cash deposit shall be payable in U.S. currency, remitted to an average adjuster of Owner's choosing and held in a special account in the adjuster's name, with interest thereon to become a part thereof pending settlement of general average.

In the event of accident, danger, damage or disaster, before or after commencement of a voyage, resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequences of which Owner is not responsible by statute, contract or otherwise, the cargoes and Charterer shall contribute with Owner and the Vessels in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred with respect to the cargoes.  If a salving ship is owned/operated by Owner, salvage shall be paid for as fully and in the same manner as if such salvage ship belonged to strangers.

**11.    BOTH TO BLAME**

In the event of cargo damage resulting from collision, if the Vessels or either of them should collide or come into contact with another ship or object as a result of the negligence of the other ship or object and any act, neglect or default of master, mariners, pilot or servants of Owner in the navigation, management or maintenance of the Vessels, Charterer shall indemnify Owner and the Vessels from and against all loss and liability to the other or non-carrying ship, her owners and any third parties insofar as such loss and liability represents a loss of, damage to or any claim whatsoever of Charterer, the owners of the cargoes and/or their underwriters, paid or payable by the other or non-carrying ship, her owners or third parties to Charterer, the owners of the cargoes or their underwriters and set off, recouped or recovered by the other or non-carrying ship, her owners or any third parties as a part of their claim(s) against Owner and/or the Vessels.  The foregoing shall apply when the owners, operators or those in charge of any ship or object other than or in addition to those colliding are at fault with respect to such collision or contact.

**12.    FORCE MAJEURE**

Neither party shall be responsible for delay or inability to perform caused by: acts of God; perils of the sea; adverse weather conditions; errors in the navigation or management of a Vessel; breakdown or defects in the hull, machinery, equipment, hawsers or lines of a Vessel for reasons beyond Owner's ability to control and not resulting from a lack of due diligence to make the Vessel seaworthy at the commencement of voyage; strikes and/or labor troubles; war; restraint or seizure by government or belligerent party; acts of terrorism; riot or civil commotion; epidemic; quarantine; embargo; deviation in attempt to save life or property at sea; fire or explosion; and/or any other cause which is beyond the actual direct control of a party.

**13.    CLAUSE PARAMOUNT**

The parties agree that the United States Carriage of Goods by Sea Act (COGSA) shall be deemed fully incorporated herein by reference and shall govern Owner's performance and responsibilities to Charterer, and its rights and limitations, as applicable, including prior to loading and following discharge

**14.    CONSEQUENTIAL DAMAGES**

Neither Owner, Charterer nor any Vessel shall be responsible for any special or consequential damages whatsoever, including without limitation any claim for extra expense, loss of earnings, loss of profits, loss of use and business interruption, whether resulting from negligence, unseaworthiness, breach of this agreement or otherwise, even if the possibility of such damages may have been foreseeable.

**15.    LIMITATION OF LIABILITY**

This agreement is not a personal contract nor shall it otherwise operate to prohibit or deny a party the benefits of any limitation of or exemption from liability afforded to shipowners by any statute or rule of law.

## 16.    EXTENSION OF BENEFITS

All exceptions to, exemptions from, defenses to, immunities from and limitations upon liability granted to a party, whether by operation of this agreement or applicable law, shall be automatically extended to and for the benefit of: all lawful business entities parent to, subsidiary of, affiliated with and/or under the management or control of that party, as well as the shareholders, members, managers, officers, directors, employees and agents of each such entity; and all Vessels provided by that party under this agreement, including its/their owners, demise charterers, managers, operators, masters, officers and crew.

## 17.    TERMINATION

A.    <u>Owner</u>.  Owner may terminate this agreement in the event Charterer fails to pay hire, charges or any other amount when and as due under this agreement.

B.    <u>Charterer</u>.  Charterer may terminate this agreement in the event the Vessels or either of them breaks down or is otherwise unable to perform services for a continuous period of seven (7) days with Owner having failed to provide a substitute or otherwise resume performance; in such event, hire shall continue to accrue until the Vessels have returned to the agreed redelivery port/place or for such period of time routinely required for the Vessels to return to such port/place, whichever is less.

C.    <u>Automatic</u>.  This agreement shall terminate automatically upon the filing of any type of bankruptcy, the making of a general assignment for the benefit of creditors, the appointment of any type of receiver and/or the filing of any type of petition for reorganization or bankruptcy by or against either party.

D.    <u>Loss of Supply</u>:  After 6 month of firm hire period, in the event the Charterer loses their supply agreement and cannot find product from a different supplier, they may cancel the agreement, given 30 days' notice and an early lump sum cancellation fee of $450,000, in addition to any charter hire or mobilization fees.  It is expressly agreed that the aforesaid early termination fee represents reasonable liquidated damages for early termination and is not a penalty.

## 18.    SALVAGE AWARDS

Any salvage shall be for the benefit of Owner so long as the salvage effort does not lead to loss/damage to cargoes and so long as Charterer does not suffer economic loss due to service interruption; if either of the two latter eventualities occur, the parties shall share such salvage award equally after deduction of hire paid by Charterer under this agreement and expenses incurred by Owner for the salvage.

## 19.    LIENS

A.    <u>Vessel Liens</u>.  Charterer shall not create or suffer to exist any lien whatsoever upon the Vessels or either of them.  Charterer shall indemnify and hold harmless (including legal fees and costs) Owner of and from any lien upon the Vessel(s) arising out of the acts or omissions of Charterer and, should the Vessel(s) be arrested or detained by reason of any such lien, Charterer shall, at its sole risk and expense, take all reasonable steps to secure the prompt release of the Vessel(s) including, without limitation, the establishment of appropriate security and/or bonds.

B.    <u>Cargo Lien</u>. Notwithstanding anything to the contrary Owner/Carrier shall have both a maritime and consensual lien upon all cargoes loaded to and/or transported aboard the Barge which shall attach to the cargoes *in rem* upon loading, continue while aboard the Barge during transportation and expressly survive discharge/delivery to any facility or ship and otherwise until all hire, charges and other amounts due Owner have been received, including without limitation accrued interest as well as any legal fees and litigation costs incurred by Owner in order to collect any such amount due, to assert, enforce and/or perfect any such lien upon the cargoes, and/or make claim, arrest and/or sell any such cargoes pursuant to any such lien. Owner shall not be bound by any attempt whatsoever by any person to restrict, limit or prohibit its lien rights with respect to any cargoes which are loaded to and/or transported aboard the Barge.

C.    <u>Necessaries Lien</u>. In addition where the cargoes are being supplied to a ship, it is acknowledged and agreed that, in addition to any other security, an agreement is being entered into with the ship itself, in rem, that the cargoes are being supplied upon the faith and credit of the ship, and that a maritime lien upon the ship is being created in favor of Owner for the provision of such necessaries to the ship. If Charterer is not the owner of the ship, Charterer hereby expressly warrants it has express authority from the owner of the ship to pledge the ship's credit as aforesaid, and that it has given express notice of this clause to the owner of the ship, prior to the loading of the Barge. Owner shall not be bound by any attempt whatsoever by any person to restrict, limit or prohibit its lien or liens attaching to any such ship to whom cargoes are being supplied, unless Charterer has requested and Owner has agreed to the same in writing and in advance, before any such cargoes have been loaded.

## 20.  ASSIGNMENT AND SUBCHARTERING

Owner/Carrier may assign this agreement in whole or part to the Operator named above and/or other affiliates of Owner/Carrier, including for purposes of subcontracting performance of the transportation services. Owner/Carrier may also assign its right to receive hire, charges and other such amounts due hereunder to its affiliates and/or lenders. Except for the foregoing, neither party may assign this agreement without the advance written consent of the other, which consent shall not be unreasonably withheld.

## 21.  APPLICABLE LAW AND JURISDICTION

This agreement shall be governed by the general maritime law of the United States or by the laws of the State of Washington, without reference to its conflicts of laws provisions, in the event there is no applicable general maritime rule of law. The parties submit to the exclusive venue and personal jurisdiction of the courts located in Seattle, Washington with respect to any dispute arising out of this agreement, with the substantially prevailing party to recover its reasonable legal fees and costs of litigation.

## 22.  COUNTERPARTS AND EXECUTION

This agreement may be executed in counterparts and/or by electronic exchange of signatures, with all such counterparts deemed the same single agreement and signatures exchanged by electronic means deemed equivalent to originals.

## 23.    INTEGRATION AND HEADINGS

This constitutes the entire agreement between the parties and expressly supersedes all prior and contemporaneous agreements, written and oral.  This agreement shall not be modified except through a writing signed by both parties.  This agreement shall be construed neutrally, and as the commemoration of the mutual assent of both parties, rather than for or against a party.  The headings used above are for convenience of reference only and are not substantive.

SIGNATURES ON NEXT PAGE

DATED THIS 14th DAY OF November , 2022

**OWNER/CARRIER**
**HARLEY MARINE FINANCING, LLC:**

_____
Authorized Signature

Matt Godden, President and CEO
Printed Name and Title

**CHARTERER**
**ALOHA PETROLEUM LLC:**

_____
Authorized Signature

Amber Harach VP Supply & Trading Ops
Printed Name and Title